

FILED

2013 Mar-04  PM 05:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JAMES GUSTIN and** | ) | |
| **ASHLEY I. GUSTIN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **OPPOSED** |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO:** |
| | ) | **2-11-cv-3795-JEO** |
| **ALLIED INTERSTATE LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT ALLIED INTERSTATE LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Allied Interstate LLC ("Allied"), by and through

counsel, and submits the following memorandum of law in support of its motion

for summary judgment.  Allied requests that the Court enter full and final summary

judgment in Allied's favor and against Plaintiffs as set forth below:

{W0347571.1 }

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**……………………………………………………………**3**

**STATEMENT OF UNDISPUTED, RELEVANT, MATERIAL FACTS**……**3**

**STANDARDS FOR SUMMARY JUDGMENT**……………………….....**20**

**ARGUMENT**…………………………………………………………….**21**

      **I.**    **Allied Did Not Violate Any Provision Of The FDCPA**…………**21**

           **A.**   **Illegal Contacts by Defendant to a Consumer Known to be Represented by an Attorney**…………………………….…**22**

           **B.**   **Illegal Third-Party Contacts**……………………………....**27**

           **c.**   **Misrepresentations by Defendant**…………………………**31**

      **II.**   **Plaintiffs' Negligence Claim Fails, As Allied Owed No Legal Duty to Plaintiffs and Allied Did Not Breach Any Duty Allegedly Owed to Them**…………………………………………………………..**32**

      **III.**   **Allied Was Not Reckless or Wanton in Its Collection Efforts**…..**34**

      **IV.**   **Plaintiffs' Invasion of Privacy Claim Fails as a Matter of Law**…**35**

      **V.**    **Plaintiffs' Outrage Claim Fails as a Matter of Law**……………..**40**

      **VI.**   **Plaintiffs' Claims for Negligent Training and Supervision and Reckless and Wanton Training and Supervision Claims Fail as a Matter of Law**…………………………………………………**41**

      **VII.**  **As all of Allied's Collection Efforts were Directed to Ms. Gustin, James Gustin's Claims, with the Possible Exception of the § 1692c Claims, are Due to Be Dismissed for Lack of Standing**…………**43**

**CONCLUSION**………………………………………………………....**45**

**CERTIFICATE OF SERVICE**………………………………………**46**

## INTRODUCTION

This case involves claims against Allied, a debt collection agency, arising from Allied's legitimate debt collection efforts toward Plaintiff Ashley Irwin Gustin in an effort to collect a defaulted federal student loan from her.  Ms. Gustin and her husband, James Gustin, assert seven causes of action against Allied—(1) for violation of three sections of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*; (2) negligence; (3) recklessness and wantonness; (4) negligent training and supervision; (5) reckless and wanton training and supervision; (6) invasion of privacy; and (7) intentional infliction of emotional distress.  As set forth herein, all of Plaintiffs' claims are due to be dismissed as a matter of law.

## STATEMENT OF UNDISPUTED, RELEVANT, MATERIAL FACTS

1.     On July 27, 2001, Ms. Gustin executed a Direct Loans Master Promissory Note under the William D. Ford Federal Direct Loan Program.  A copy of the promissory note is attached hereto as Exhibit A.  With the loan proceeds, Ms. Gustin was able to attend and graduate from college in 2005.  Deposition of Ashley Gustin, p. 14, 45-46, a copy of which is attached hereto as Exhibit B.

2.     Ms. Gustin asserts she first learned of her "alleged responsibility" for, and "alleged liability" on, the subject loan when she began receiving collection letters and telephone calls in April 2010 from non-party Financial Asset

Management Systems or "FAMS," which, like Allied, is a debt collection agency with which the federal government contracts to collect defaulted student loans like Ms. Gustin's.  Complaint, ¶¶ 6, 13; Deposition of Heather Hornbuckle, p. 40, a copy of which is attached hereto as Exhibit C.

3.     Ms. Gustin avers that "[t]o the best of [her] recollection, she did not recall applying for such a Student Loan, but only that her father had her 'sign a bunch of papers' when she enrolled in school.  If there was any Student Loan liability, she understood that her father was the one who was liable."  *Id.* ¶ 7.

4.     "Surprised by the fact that she had been out of school many years and never had any contact regarding the Student Loans, [Ms.] Gustin requested information from FAMS regarding the Student Loans."  *Id.* ¶ 8.

5.     Plaintiffs also allege they contacted attorney Dennis Goldasich to "represent them" with regard to Ms. Gustin's "alleged liability" on the loan.  *Id.* ¶ 13.  Plaintiffs contend Mr. Goldasich informed FAMS of the representation and requested verification of the loan from FAMS and the U.S. Department of Education ("DOE").  *Id.* ¶ 14.

6.     In their Complaint, Plaintiffs assert FAMS sent to Mr. Goldasich an "application for student loans allegedly signed by [Ms. Gustin]."  *Id.* ¶ 15.  The "application," a copy of which both Plaintiffs and Allied produced in discovery in this action, is actually the promissory note attached hereto as Exhibit A.

7.      Plaintiffs imply the promissory note is insufficient evidence of Ms. Gustin's liability on the loan: "[n]o other evidence of [Ms. Gustin's] alleged responsibility on the Student Loans in question was ever sent."  Complaint, ¶ 15. Not only are Plaintiffs incorrect about the promissory note irrefutably establishing Ms. Gustin's liability on the loan, they are also wrong about not receiving any further evidence of her liability.

8.      On or about April 16, 2010, FAMS sent its initial correspondence to Ms. Gustin apprising her that DOE had placed her defaulted and "seriously delinquent" student loan with FAMS.  A copy of FAMS' correspondence and enclosures is attached hereto as Exhibit R.  Further, on or about July 28, 2010, DOE sent a loan statement to Ms. Gustin, informing her that the then current principal for the defaulted student loan was $24,464.27, and the current accrued interest was $1,880.95, for a total of $26,345.22.  *See* loan statement, a copy of which is attached hereto as Exhibit D.  In the statement, DOE informed Ms. Gustin as follows:

> The [DOE] holds the following defaulted student loan(s) . . . which it intends to collect by treasury offset against all payment streams authorized by law. . . . These payment streams may include (but are not limited to) federal and/or state tax refunds, Social Security benefits, federal travel reimbursements, and may be payments to which you are entitled to receive either now or in the future.  Please read the enclosed notice of proposed treasury offset for an explanation of your rights and the manner in which you must exercise them to avoid offset.  The [DOE] may have already referred for offset some of

the debts listed on this statement, as explained in prior notices.  Any
in-person hearing will be held in Chicago.

Exhibit D.  Ms. Gustin did nothing in response to the loan statement, including

requesting a hearing to lodge any dispute she may have had regarding the loan.

Gustin Dep., p. 76.

9.    On June 10, 2010, Mr. Goldasich wrote to FAMS, stating as follows:

As you know, I represent Ashley Irwin relating to a letter your
company recently sent her regarding an attempt to collect a student
loan.  As we discussed via telephone earlier today, Ms. Irwin disputes
this debt and was completely unaware that she had a student loan unto
[*sic*] she received the most recent letter.  Apparently, all previous
letters were sent to her father's house where she has never maintained
a residence.

Please let this letter serve as a formal request for a copy of any and all
documents in your company's possession relating to the loan you are
attempting to collect. . . . Once I receive these documents I will
review them on behalf of Ms. Irwin **and inform you of her intent**.

Mr. Goldasich's June 10, 2010 correspondence, a copy of which is attached hereto

as Exhibit E (emphasis added).

10.    FAMS required an authorization signed by Ms. Gustin for FAMS to

release the requested documentation to Mr. Goldasich, and on August 25, 2010,

Mr. Goldasich's firm provided the signed authorization *to FAMS*.  *See* Mr.

Goldasich's  August  25,  2010  correspondence  and  Ms.  Gustin's  signed

authorization dated July 11, 2010, a copy of which is attached collectively hereto

as Exhibit F.

11.    After receiving underlying loan documentation from FAMS, Mr.

Goldasich wrote to FAMS on September 20, 2010, stating:

> I have received the six (6) pages of documents your company
> produced in response to my request for the entire loan file regarding
> Ms. Irwin.   Thank you for the documents that you did provide.
> However, I did not see any documents or records regarding any
> statements of account, billing statements, requests for payment, or
> collection correspondence between your company and Ms. Irwin.
> Does that exist?  If so, please produce this information as soon as
> possible so that we will be able to evaluate your claim that Ms. Irwin
> owes your company money.

Mr. Goldasich's September 20, 2010 correspondence, a copy of which is attached

hereto as Exhibit G.

12.    On February 16, 2012, three months after filing this action, Plaintiffs'

counsel John Hubbard wrote to undersigned counsel "[i]t's hard for us to get a

good read on the value of the case without finding out if  Ashley Gustin is liable on

the student loans.  I talked to the Gustins earlier and she still does not remember

executing the loan documents.  Has your client provided any documents regarding

this issue?"  A copy of counsel's email correspondences is attached hereto as

Exhibit H.

13.    On February 17, 2012, undersigned counsel produced a copy of the

promissory note—the same document which Plaintiffs admit FAMS provided to

Mr. Goldasich in September 2010.  *See* Exhibit H.  Mr. Hubbard's response to

receiving the second copy, at least, of the promissory note was ". . . based on the

executed documents provided, I do not think [Ms. Gustin] will be able to dispute that she does not owe them.  That should not be an issue anymore."  *See id.* Perplexingly, however, despite all the documentation which FAMS, DOE, and Allied provided to Ms. Gustin and her lawyers establishing her liability on the debt, Ms. Gustin testified she has "received absolutely nothing regarding this loan" from FAMS or "[f]rom anyone."  Gustin Dep., p. 34.

14.    Also incredibly, Ms. Gustin testified during her deposition on September 7, 2012, that that was the first time she was seeing the Promissory Note. *See* Exhibit A.   Regarding her signature on the Promissory Note, Ms. Gustin testified as follows:

> Q. (BY MR. YOUNG) Okay, so sitting here today is the first time you've seen Defendant's [Exhibit] 2 [the Promissory Note]?
>
> A. Yes.
>
> Q. All right. . . . [I]s that your signature at the bottom?
>
> A. It looks like it could be my signature.
>
> Q. Do you have any doubt in your mind that it's your signature?
>
> A. I mean, it's not my signature now, but it looks like it could be.
>
> Q. Do you believe your signature was forged on this document?  You don't have any understanding that that occurred, do you?
>
> A. I mean, this is the first time seeing it, so. . .
>
> Q. Does that look like your signature back in July of 2001?  You said your signature had changed a little bit.

A. It looks like it could be.

Q. Okay.  But you don't remember signing this, or do you?

A. No.

Q. You don't have any understanding that your signature was forged—

A. No.

Q. —on Defendant's [Exhibit] 2?

A. No.

Gustin Dep., pp. 38-39.

15.    Plaintiffs allege that shortly after Mr. Goldasich received the promissory note from FAMS, ". . . Plaintiffs and Mr. Goldasich stopped receiving communications from FAMS, and assumedly, the file was transferred to [Allied] to continue collection activities."  Complaint, ¶ 16.

16.    Following FAMS' unsuccessful attempts to collect the loan balance from Ms. Gustin, DOE referred the account to Allied for additional collection efforts on October 25, 2010.  Hornbuckle Dep., pp. 115-16.  Upon receiving Ms. Gustin's account, as with all accounts it receives from DOE, Allied sent an initial correspondence to Ms. Gustin informing her, *inter alia*, that DOE had placed the account with Allied.  *Id.* p. 116; Exhibit I, which represents an exemplar of Allied's initial correspondence to Ms. Gustin.  Contrary to her testimony she

"received absolutely nothing regarding this loan" from FAMS or "[f]rom anyone," Ms. Gustin testified she actually received one or more "statements" from Allied. Gustin Dep., pp. 34, 91-93.

17.    DOE maintains a computer-based system that is separate and apart from Allied's system.  Hornbuckle Dep., pp. 41-44.  At the time DOE placed Ms. Gustin's account with Allied, Allied had limited access to some account notes in DOE's system, but not to documents that may have been contained in DOE's system.  *Id.* pp. 42-44.  Attached hereto as Exhibit J is a screen shot of DOE's account notes regarding Ms. Gustin's loan.  *See* Hornbuckle Dep., p. 79.  As Allied had the account beginning on October 25, 2010, the following entries from DOE's system, *inter alia* and in reverse chronological order, were visible to Allied as of that date:

> 08/30/2010 12:00 . . .
> RCVD LTR FRM BWR ATTY & BWR GVG AUTH TO ATTY DENNIS GOLDASICH TO ACCESS LN ACCT INFO. . . .
>
> 06/11/2010 12:00 . . .
> RCVD FAXD FRM BWR ATTY DENNIS GOLDASICH JR REQ VERI & VALIDATION OF DEBT.

DOE Account Notes, Exhibit J.

18.    As all agencies making collection efforts on DOE's behalf are required to document DOE's system when an agency receives a correspondence regarding a borrower's account, FAMS had inputted, during the period it had the

account, those two entries in DOE's system, which correspond to Mr. Goldasich's June 10, 2010 and August 25, 2010 letters to FAMS.  Hornbuckle Dep., p. 133; Exhibits E and F.  At no time while the account was placed with Allied did it have access to the letters themselves between Mr. Goldasich and FAMS.  *Id.* p. 133. The only information visible to Allied was the above-quoted text that FAMS inputted in DOE's system interpreting the contents of Mr. Goldasich's letters.

19.    On October 26, 2010, an Allied collector notated Allied's account notes: "LKD [looked] ON DOE . . . AND TH BRRW [borrower] IS WRKNG [working] W/ ATTY [attorney] . . . GOLDASICH JR. . . . DISPUTING TH DEBT. ."  Allied Account Notes, Exhibit K; Hornbuckle Dep., pp. 118-19.

20.    When asked whether DOE's account notes, dated June 11 and August 30, 2010, should have indicated to Allied, two months later when it received the account from DOE, that Ms. Gustin was in an "active" attorney-client relationship with Mr. Goldasich, Ms. Hornbuckle answered in the negative and explained why the DOE account notes did not preclude Allied's contacts with Ms. Gustin and why Allied's agent who made the October 26, 2010 entry in Allied's system was inarticulate with his or her description of what Allied actually knew of Ms. Gustin's and Mr. Goldasich's relationship, if any, at the time DOE placed the account with Allied:

> At this point in time, with [DOE's] documentation, we had no contact
> with the borrower. . . . [W]e did not know or have a name and an

address that they were being represented by an attorney.  Like I said before, . . . I don't know why they documented it this way.  But it should never have been documented this way technically per the documentation that was on [DOE] system. . . .

Per the [DOE's] notations and this, yes, they were allowed to continue to make a phone call.  I do not believe that we broke any law. . . .

So we would have to assume, by looking at [DOE's system notes], that you sent that to FAMS.  I don't know what that letter states.  Our agents don't know what that letter states.  It could have had an expiration date on it.  It could have maybe not been in regard to the same debts we are holding.  We don't know, because that letter went to FAMS and not to us. . . .

Again, we knew a letter was sent [to FAMS], correct.  I don't know what that letter stated in there.  So I cannot state that as of October 26th, 2010, over two months have elapsed since this letter came in, if they were still being represented by an attorney, . . . was it even in regard to the loans, all the loans we had, all the disbursements we had.  I don't know that what was in that letter, so I cannot assume that, as well as it only states your name, I don't know an address, I don't have a phone number.  I have nothing else to go off of.  I cannot assume that.

Hornbuckle Dep., pp. 123, 129, 132, 135, 139.

21.    Ms. Hornbuckle testified further that in the intervening two months

prior to Allied's receiving the account from DOE, Ms. Gustin could have revoked

her consent to FAMS allowing that agency to communicate with Mr. Goldasich.

*Id.* p. 149.

22.    Ms. Hornbuckle also testified as follows:

Q. Does Allied have the obligation, once it has whatever information regarding an attorney, whatever that information is, to go and verify exactly what that attorney's status is with the borrower?

A. If we are being told by a consumer that they are being represented by an attorney and they give us the information that we are required to have, which is the name and address or contact information so that we can validate that information, then we would go that route. If they don't give us that information, then we have to try to obtain that information. . . .

A. Yes, I believe we were able to go ahead and contact—we as Allied Interstate had that right, when that account was placed with us, to reverify that and validate that when Ms. Gustin did not provide us that information.

Q. What is sufficient notification to Allied?

A. Ms. Gustin would have needed to tell us that she was being represented . . . by an attorney, given us the full name of the attorney and an address and/or phone number so that we could contact that attorney at that time, which was never given to us.

Hornbuckle Dep., pp. 145, 149-50.

23.     When asked whether, if Allied had had access to Ms. Gustin's July 11, 2010 authorization—the actual document—Allied would have been required to contact only Mr. Goldasich and not Ms. Gustin, Ms. Hornbuckle testified as follows:

If I did have access to this information, which we did not because it was sent to FAMS and not to us, and this is also hereby authorizing [FAMS] to release and disclose any information as well.

So we would still not be able to communicate with you because of the fact this is authorization for FAMS to communicate with you, not Allied Interstate. So I would still have to re-get all the information again.

Hornbuckle Dep., p. 157.

24.     On November 6, 2010, with no contact having been made yet with Ms. Gustin, and having no confirmed telephone number for her, an Allied collector, Yvetta Schwartz, placed a telephone call in an effort to acquire "location information" for Ms. Gustin, which is permissive under 15 U.S.C. § 1692b of the FDCPA.  Schwartz Dep., pp. 31-34, 47-48, a copy of which is attached hereto as Exhibit L.  Ms. Gustin's aunt, Susan LeFoy, answered the call, and Ms. Schwartz learned at that time she had telephoned a third-party.[1]  Schwartz Dep., pp. 47-48.

25.     Ms. Schwartz testified Ms. LeFoy asked for Ms. Schwartz's name and telephone number and stated she would pass the information along to Ms. Gustin.  *Id.* pp. 47-48.  Ms. Schwartz gave her name and number only to Ms. LeFoy and ended the call.  *Id.*

26.     Ms. LeFoy testified she has a vague recollection of an individual calling for Ms. Gustin sometime in 2010, but she has no recollection as to who called, when he or she called, what company, if any, he or she represented, why he or she was calling (other than to speak with Ms. Gustin), and what he or she said during the call.  Affidavit of Susan LeFoy, ¶ 4, a copy of which is attached hereto as Exhibit M.  Contrary to Plaintiffs' allegations, *see* Complaint, ¶ 26, Ms. LeFoy testified she certainly has no recollection that the individual who called disclosed

---

[1] Ms. Gustin's father, Thomas Irwin, is Ms. LeFoy's brother.  Mr. Irwin, who is listed as a reference on the Promissory Note (*see* Exhibit A), lived with Ms. LeFoy at her residence for approximately three years, from about 1996 to 1999.  Exhibit M, ¶ 3.

to her anything about a debt of Ms. Gustin's or that the call even regarded a debt. LeFoy Aff., ¶ 5.  Also contrary to Plaintiffs' allegations, *see* Complaint, ¶ 26, Ms. LeFoy has no recollection that the individual attempted to get her to coerce Ms. Gustin into paying any debt, nor does Ms. LeFoy believe that occurred.  LeFoy Aff., ¶ 5.

27.     Following Ms. Schwartz's conversation with Ms. LeFoy on November 6, 2010, Allied had a total of four conversations with Ms. Gustin.  *See generally* Allied Account Notes, Exhibit K; Gustin Dep., p. 155.   The first conversation occurred on November 8, 2010, when Ms. Gustin telephoned Allied after speaking with Ms. LeFoy.  Gustin Dep., pp. 136-37.  Allied's account notes reflect that Ms. Gustin orally disputed the debt; stated she was interested in getting out of default; but refused to discuss the matter with Allied.  *Id.* p. 137.  According to the account notes, Ms. Gustin stated she is going to have her attorney call Allied and hung up.  *Id.*  It is undisputed Ms. Gustin, in the November 8 conversation with Allied, did not provide Mr. Goldasich's name or contact information to Allied.  Gustin Dep., p. 140.

28.     When questioned whether Allied's account notes accurately reflect the November 8 conversation, Ms. Gustin twice testified she does not remember. Gustin Dep., pp. 137-139.  In fact, Ms. Gustin candidly admitted that between FAMS' collection efforts and Allied's subsequent collection efforts, "[i]t runs

together."  Gustin Dep., p. 171.  It "runs together" so much that in her deposition, Ms. Gustin consistently referred to Allied and FAMS interchangeably and referred to the letters which Mr. Goldasich had sent to *FAMS* as letters that he had sent to *Allied*, when it is undisputed neither Plaintiffs nor Mr. Goldasich ever sent any correspondence to Allied.  *See* Gustin Dep., pp. 24-25, 91, 169-72.  Ms. Gustin agreed that for all she knew, when Allied began its collection efforts in November 2010, it was still FAMS which was communicating with her ("Yeah, I mean, I never knew the difference between who was calling me. . . . [W]ho was addressing me, I was unclear.").  Gustin Dep., p. 169-72.  Even Mr. Goldasich himself, actually during Ms. Gustin's deposition, began to realize the apparently final letter he sent to FAMS on February 21, 2011, was actually *sent to FAMS* and not Allied.  *See id.*, pp. 24-25, 90-91.  A copy of Mr. Goldasich's February 21, 2011 letter is attached hereto as Exhibit N.

29.    Not having heard from Ms. Gustin's attorney, the second conversation between Allied and Ms. Gustin occurred two weeks later on November 22, 2010, when Allied telephoned Ms. Gustin.  *See* Gustin Dep., pp. 140-41; Allied Account Notes, Exhibit K.  The Allied representative documented the account notes that Ms. Gustin stated her husband would like to talk to the representative regarding the debt, but Mr. Gustin was not "there right now."  *See id.*  Ms. Gustin stated she would have Mr. Gustin call Allied, and the call ended.  *See id.*  Again, when asked

whether Allied's account notes accurately reflect the November 22 conversation, Ms. Gustin testified "I have no way to know if that's accurate."  Gustin Dep., p. 141.

30.    Not having heard from Ms. Gustin's attorney or husband, Allied telephoned Ms. Gustin again on January 3, 2011.  *See* Gustin Dep., pp. 141-42; Allied Account Notes, Exhibit K.  In that conversation, Ms. Gustin stated she was waiting on a doctor's telephone call.  *See id.*  The Allied collector thanked her and ended the call.  *See id.*

31.    Having received no return call from Ms. Gustin or anyone on her behalf, the fourth and final call between Allied and Ms. Gustin occurred on February 11, 2011, and resulted in Ms. Gustin's agreeing to a payment plan to pay off her debt.  *See* Gustin Dep., pp. 152-55; Allied Account Notes, Exhibit K.

32.    Despite her testimony that it is possible she had merely four conversations with Allied, Ms. Gustin alleges she had additional conversations, beyond the four set forth above, with Allied collector Franklin Collins.  Gustin Dep., pp. 118-19, 155.  In one such conversation, Ms. Gustin alleges Mr. Collins knew Mr. Goldasich was representing her in connection with the debt because he read Mr. Goldasich's name "off of his computer."  *Id.* p. 118.

33.    Mr. Collins testified that because the account notes reflect only that he placed telephone calls to Ms. Gustin, but with no conversation taking place, no

conversation ever took place between them.  Collins Dep., pp. 17-18, a copy of which is attached hereto as Exhibit O.  The apparent dispute surrounding that fact, however, is not material and thus not determinative vis-à-vis this motion.  The undisputed material fact is that in this alleged conversation with Mr. Collins, Ms. Gustin still did not give Mr. Goldasich's contact information to Mr. Collins but instead "assumed" he had it.  Gustin Dep., p. 119.

34.    It is further undisputed that on January 14, 2011, and based on his review of Allied's and DOE's account notes, Mr. Collins "googled" Mr. Goldasich's name and contact information.  Collins Dep., pp. 29-31.  Mr. Collins did not know whether Ms. Gustin was in fact represented at that time or whether Mr. Goldasich represented her in connection with the subject debt.  *Id.* p. 31.  Mr. Collins testified he "placed a call to what was believed to be the possible borrower's attorney, so possibly Mrs. Gustin's attorney, and then it looks like I spoke with a paralegal there, who took my information and advised she would pass the message along" to Mr. Goldasich because he was not in the office.  *Id.* p. 29.

35.    It is undisputed that neither Mr. Goldasich nor anyone from his office nor anyone on Plaintiffs' behalf, including Plaintiffs' other two lawyers in this action, returned Mr. Collins's call or otherwise telephoned Allied, sent any correspondence to Allied, or communicated with Allied in any way at any time whatsoever during the nearly four-month period in which Allied was attempting to

collect the debt from Ms. Gustin—October 25, 2010, to February 11, 2011—or otherwise apprised Allied that Ms. Gustin was represented by counsel with respect to the subject debt.   *Id.* p. 30; Plaintiffs' responses to Allied's requests for admission, nos. 1-16, a copy of which is attached hereto as Exhibit P ("16. Admit that at no time prior to the filing of this action did any lawyer communicate to Allied, orally or in writing, that he or she represents Ashley Gustin and/or James Gustin with regard to the subject debt.  **RESPONSE: Admitted, Mr. Goldasich did not have any communication with Allied prior to the filing of this action. Plaintiffs contend that Mr. Goldasich did have previous communications, including written correspondence that referenced his representation of the Plaintiffs, with the DOE and FAMS and these communications were notated in the DOE system**.").

36.     Instead, in response to Mr. Collins's call, Mr. Goldasich, mistakenly "still believing that the loan was with [FAMS], sent a letter to *FAMS* dated February 21, 2011."  Exhibit P, Plaintiffs' responses, nos. 4, 6 (emphasis added); Exhibit N, Mr. Goldasich's February 21, 2011 letter.  In his letter to FAMS, Mr. Goldasich stated as follows:

> As you know, this firm represents Ashley Irwin (Gustin) in this matter.  On August 25, 2010 we informed you of our representation in writing and sent a signed information release authorizing you to release any and all documents to this firm and verifying that I am her legal counsel.

Unfortunately, your office has and is continuing to violate the [FDCPA] by continuing to attempt to contact and communicate with my client directly.  The FDCPA, 15 USC 1692b(6), states that after the debt collector knows the consumer is represented by an attorney with regard to the subject debt, the debt collector must not communicate with any person other that attorney, unless the attorney fails to respond within a reasonable period of time to communication from the debt collector.

Each violation of the FDCPA is punishable by a monetary fine.  As a result, please forward to me all internal memos, computer screens or other documentation detailing the amount of times your office has attempted to contact Ashley Irwin since you received our letter of August 25, 2010.  Additionally, we have not been provided the entire file regarding this loan, despite our repeated requests.  Please provide all documentation regarding this loan and loan file immediately.

Exhibit N.

## STANDARDS FOR SUMMARY JUDGMENT

Allied moves this Court to enter summary judgment as a matter of law in its favor pursuant to Federal Rule of Civil Procedure 56.  The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required" as to a plaintiff's claims. *McIntosh v. Antinino*, 71 F.3d 29, 33 (1st Cir. 1995).  Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See generally Celotex Corp.*, 477 U.S. at 317.  Once the party seeking summary judgment successfully bears its initial burden of proof under Rule 56(c), the burden of production shifts to the nonmoving party.  Id. at 331.  The nonmoving party

must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial."  *Matsushita*, 475 U.S. at 587.  An action is devoid of a material issue for trial if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.* at 587.

## <u>ARGUMENT AND CITATION TO AUTHORITY</u>

## I.  **ALLIED DID NOT VIOLATE ANY PROVISION OF THE FDCPA.**

Plaintiffs allege in Count One that "[t]he Defendant has engaged in collection in numerous activities and practices in violation of the [FDCPA] 15 U.S.C. § 1692, *et seq.*"  Complaint, ¶ 32.  The "Factual Allegations" section of the Complaint asserts, more specifically, that Allied violated the FDCPA in three distinct ways:

> (1)   "Illegal Contacts by Defendant to a Consumer Known to be Represented by an Attorney" (Complaint, ¶¶ 17-25);
>
> (2)   "Illegal Third-Party Contacts" (Complaint, ¶ 26); and
>
> (3)   "Misrepresentations by Defendant" (Complaint, ¶¶ 27-30)

One stated purpose of the FDCPA is "to promote consistent State action to protect consumers against debt collection **abuses**."  *Winberry v. United Collection Bureau, Inc.*, 697 F. Supp. 2d 1279, 1293 (M.D. Ala. 2010) (quoting 15 U.S.C. § 1692(e)) (emphasis added).  The word "consumer" is defined in the statute as "any natural person obligated or allegedly obligated to pay any debt."  15 U.S.C. § 1692a(3).  A "consumer" can also include a consumer's spouse.  15 U.S.C. § 1692c(d).  Section 1692k creates a private right of action where "any debt collector . . . fails to comply with any provision of this subchapter with respect to any person."  *Winberry*, 697 F. Supp. 2d at 1293-94 (quoting 15 U.S.C. § 1692k). Thus, to prove their FDCPA claim, Plaintiffs must prove that (1) they have been the object of collection activity arising from consumer debt; (2) Allied is a debt collector as defined by the FDCPA; and (3) Allied has engaged in an act or omission prohibited by the FDCPA.  *Hunt v. 21st Mortg. Corp.*, 2012 WL 3903783, *5 (N.D. Ala. 2012) (quoting *Kaplan v. Assetcare, Inc.*, 88 F. Supp. 2d 1355, 1360–61 (S.D. Fla. 2000)).

Allied admits Ms. Gustin was the object of collection activity arising from consumer debt and that Allied is a debt collector under the FDCPA.  Allied engaged in lawful collection activities, however, and its calls to Ms. Gustin were legitimate debt collection calls made in an effort to collect the delinquent loan from her.

A.  **Illegal Contacts by Defendant to a Consumer Known to be Represented by an Attorney**

Plaintiffs allege Allied violated 15 U.S.C. § 1692c(a)(2), *see* Complaint, ¶¶

17-25, which provides as follows:

> Without the prior consent of the consumer given directly to the debt collector . . . , a debt collector may not communicate with a consumer in connection with the collection of any debt— . . . if the debt collector **knows** the consumer is represented by an attorney with respect to such debt **and has knowledge of, or can readily ascertain**, such attorney's **name and address**, **unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector**. . . .

15 U.S.C. § 1692c(a)(2) (emphasis added).

Plaintiffs' § 1692c(a)(2) claim fails because they cannot adduce substantial

evidence demonstrating the following:

> (1)   that Allied had *actual* knowledge that Ms. Gustin was represented by Mr. Goldasich at the time it initiated collection efforts and with regard to the specific debt that was the subject of Allied's collection efforts;

> (2)   that Allied had *actual* knowledge of or could readily ascertain Mr. Goldasich's address or other contact information; and

> (3)   that even after Allied placed a call to an Alabama attorney named "Dennis Goldasich" with the purpose of determining whether, in fact, *that* Mr. Goldasich represents Ms. Gustin in connection with the specific debt which Allied was attempting to collect, Mr. Goldasich responded to Allied's call within a reasonable period of time or even *at all*.

Abundant precedent, as well as the plain statutory language, confirms that

Plaintiffs' § 1692c(a)(2) claim requires them to prove that Allied had **actual**

knowledge that Ms. Gustin was represented by counsel with respect to the specific debt Allied was attempting to collect.  *See Eslava v. AllianceOne Receivables Mgmt., Inc.*, 2012 WL 4336012, *2 (S.D. Ala. 2012) (citing *Erickson v. General Elec. Co.*, 854 F. Supp. 2d 1178, 2012 WL 601171, *3 (M.D. Fla. 2012) ("actual knowledge is an element necessary to prove violations of FDCPA § 1692c(a)( 2)"); *Watson v. Capitol One Serv., LLC*, 2011 WL 2560230, *4 (M.D. Fla. 2011) ("In deciding what type of knowledge is required under this provision of the FDCPA, the great majority of federal courts have required actual knowledge on the part of the debt collector, declining to impute knowledge by the creditor to the debt collector."); *Micare v. Foster & Garbus*, 132 F. Supp. 2d 77, 80 (N.D.N.Y. 2001) ("Courts have construed the knowledge component of 1692c(a)(2) to require that a debt collector possess actual knowledge that the debtor was represented by an attorney.")).  *See also Randolph v. IMBS, Inc.*, 368 F.3d 726, 729 (7th Cir. 2004) (under a notice-to-counsel theory, ". . . the statute asks what the debt collector knows, not what the creditor knows.").

The undisputed evidence is that the day after DOE assigned the account to Allied, and prior to contacting Ms. Gustin, Allied saw on DOE's system two references to "borrower's attorney Dennis Goldasich."  Allied had no contact information for Mr. Goldasich then or at any time during its collection efforts. Allied was not in possession of, nor did it have access to, the letters, or their

contents, which Mr. Goldasich sent to FAMS or DOE two and four months, respectively, prior to Allied's receiving the account.  Allied did not know whether, two months after the date of the last entry in DOE's system and Mr. Goldasich's last letter, he still represents Ms. Gustin; whether he ever represented her in connection with the specific debt on which Allied would attempt collection efforts; or whether Ms. Gustin's authorization allowing FAMS and DOE to communicate with Mr. Goldasich contained an expiration date or other qualifiers.  As the law does not impute to Allied the knowledge of the creditor, DOE, or a prior collection agency, FAMS, Allied did not violate § 1692c(a)(2) when it initiated collection efforts toward Ms. Gustin.  *See Eslava*, 2012 WL 4336012, *2.

Further, once Allied began communicating with Ms. Gustin, it is undisputed she never gave any of Mr. Goldasich's contact information—neither an address nor phone number—to Allied so that it could begin communicating only with him.  In fact, Ms. Gustin testified she does not remember if she told Allied during her first conversation with Allied, on November 8, 2010, that she would have Mr. Goldasich call Allied.  The undisputed evidence is, however, that Mr. Goldasich never telephoned or wrote to Allied at any time.  Further, it is undisputed Allied attempted to locate and communicate with Mr. Goldasich by "googling" his name and, using the search results, telephoning an Alabama attorney named "Dennis Goldasich" in an effort to determine whether he is in fact "the" Dennis Goldasich

who had represented Ms. Gustin and whether he, in fact, was still representing her at that time *and* in connection with the debt which Allied was attempting to collect. It is undisputed that despite Allied's efforts to obtain confirmation of this information from Mr. Goldasich, neither he nor anyone from his office nor either of Plaintiffs' other two lawyers returned Allied's call or communicated in any way, orally or in writing, with Allied.

Instead of returning Allied's call, Mr. Goldasich sent a letter to *FAMS* reminding *it* of his representation of Ms. Gustin and explaining FAMS should be communicating only with him.  It is telling that as late as September 7, 2012— nearly a year after filing suit and actually during Ms. Gustin's deposition—Mr. Goldasich's confusion (to say nothing of Ms. Gustin's confusion) between Allied and FAMS was still firmly in place.  *See* Gustin Dep., pp. 24-25, 90-91 (referring to his apparently final letter sent to FAMS on February 21, 2011, Mr. Goldasich stated "I told him [Plaintiffs' counsel John Hubbard] that when I started getting back in this case, I said where is my letter that I sent a long time ago—MR. YOUNG: That's what I would like to know, where is it?  MR. GOLDASICH: — and it's right here.").  Later in her deposition, Ms. Gustin dispelled any confusion and conceded the February 21, 2011 letter was directed and mailed to FAMS and not Allied ("Q. And he's [i.e., Mr. Goldasich] explaining to FAMS that there has been inappropriate contact by *FAMS* with you directly, is that right?  A. It appears

that way.  Q. Okay.  Now, we've looked at a bunch of letters, several, rather, from and to or between Mr. Goldasich and *FAMS*, so I just want to make sure that you're not aware of any letters between you or your lawyers and *Allied Interstate*, my client?  A. I am not aware.") (emphasis added).

For these reasons, Allied is entitled to summary judgment as to Plaintiffs' claim that Allied violated § 1692c(a)(2) of the FDCPA.  *See Goodman v. Southern Credit Recovery, Inc.*, 1999 WL 14004, *5 (E.D. La. 1999) (The language of section 1692c(a)(2) prohibits only direct communications with the debtor where a debt collector such as SCR knows that the debtor is represented by counsel 'with respect to such debt.'  The applicable law does not require a debt collector to assume that an attorney representing a consumer with respect to one or more specific debts represents that consumer with respect to all obligations which are owed by the consumer.  The authorities cited by SCR fully support granting summary judgment dismissing plaintiff's [§] 1692c(a)(2) claim with prejudice.").

### B.  Illegal Third-Party Contacts

Second, Plaintiffs allege Allied violated 15 U.S.C. § 1692c(b), *see* Complaint, ¶ 26, which provides as follows:

> Except as provided in section 1692b [§ 804] of this title, without the prior consent of the consumer given directly to the debt collector, . . . a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer [or] his attorney. . . .

15 U.S.C. § 1692c(b).

Thus, a collector is prohibited from communicating with someone other than the consumer or the consumer's attorney in attempting to collect the debt *except* to obtain location information pursuant to § 1692b of the FDCPA. *See Pelfrey v. Educational Credit Mgmt. Corp.*, 71 F. Supp. 2d 1161, 1165 (N.D. Ala. 1999). In seeking location information, the collector must identify himself to the third-party but not discuss the debt. A collector may contact a third-party to obtain location information only once unless the third-party requests additional communications or the collector "reasonably believes" that the third-party's response to the prior communication was erroneous or incomplete and that the third-party now has correct or complete location information. *Pelfrey*, 71 F. Supp. 2d at 1165, n.4 (citing 15 U.S.C.A. § 1692b(3)).

The undisputed evidence is that on November 6, 2010, in an attempt to acquire location information for Ms. Gustin, Allied telephoned on *one* occasion an individual whom it would learn is Ms. Gustin's aunt. The two parties to that conversation—Ms. Schwartz and Ms. LeFoy—have testified that nothing whatsoever regarding the subject debt was discussed in that call. Ms. Schwartz testified that when Ms. LeFoy asked for Ms. Schwartz's name and telephone number, Ms. Schwartz gave her that information only and ended the call.

Similarly, and contrary to Plaintiffs' allegations, *see* Complaint, ¶ 26, Ms. LeFoy testified that though she has a vague recollection of that call, she certainly has no recollection that the individual who called disclosed anything to her about a debt or that the call even regarded a debt. Also contrary to Plaintiffs' allegations, *see id.*, Ms. LeFoy testified she has no recollection that the individual who called attempted to get her to coerce Ms. Gustin into paying any debt, nor does Ms. LeFoy even believe that occurred.

Allied anticipates Plaintiffs may argue that Allied violated § 1692c(b) when Ms. Schwartz complied with Ms. LeFoy's request and gave Ms. Schwartz's telephone number. Providing a telephone number, however, does not constitute a "communication" under the FDCPA. *See Marx v. General Revenue Corp.*, 668 F.3d 1174, 1177-78 (10th Cir. 2011). The FDCPA provides that a "debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer." 15 U.S.C. § 1692c(b). A "communication" is defined as the "conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). In *Marx*, the Tenth Circuit reasoned cogently as follows:

> The facsimile in question is not a "communication" under the FDCPA. A third-party "communication," to be such, must indicate to the recipient that the message relates to the collection of a debt; this is simply built into the statutory definition of "communication." This fax cannot be construed as "conveying" information "regarding a debt." Nowhere does it expressly reference debt; it speaks only of

"verify[ing] [e]mployment."  Nor could it reasonably be construed to imply a debt.  In order to substantiate the claim that the facsimile "conveys" information "regarding a debt," either "directly or indirectly," Ms. Marx had the burden of proving such a conveyance; the standard is not whether the facsimile could have had such an implication.  No testimony shows that Ms. Marx suffered any actual harm (such as embarrassment or a denial of promotion) or that her employer was aware that the facsimile in any way concerned a default on a student loan. . . . Ms. Marx did not call any witnesses from her employer's office to testify as to what they inferred from the facsimile. . . .

Instead, she argues that the existence of a debt was implied by the ID or account number that appeared on the facsimile; this, she claims, makes it a "communication." . . . [A]bsent any evidentiary showing that Ms. Marx's employer either knew or inferred that the facsimile involved a debt, the facsimile does not satisfy the statutory definition of a "communication." . . .

Because we find that the facsimile did not constitute a "communication" within the ambit of the FDCPA, we need not consider whether GRC violated § 1692c(b)'s prohibition against debt-collector "communicat[ions]" with third parties.

*Marx*, 668 F.3d at 1177-78.  *See also Horkey v. J.V.D.B. & Assocs., Inc.*, 179 F. Supp. 2d 861, 868 (N.D. Ill. 2002), *aff'd*, 333 F.3d 769 (7th Cir. 2003) (finding there can be no liability under § 1692c(b) where there is no discussion of the debt); *Biggs v. Credit Collections, Inc.*, 2007 WL 4034997 at *4 (W.D. Okla. Nov. 15, 2007) (same).

Finally, the Federal Trade Commission[2] Statements of General Policy or Interpretation Staff Commentary on the FDCPA, 53 FR 50097, 1988 WL 269068, § 803(2), states that the definition of "communication" covered by the FDCPA does not include a "request to a third party for a consumer to return a telephone call to the debt collector, if the debt collector does not refer to the debt or the caller's status as (or affiliation with) a debt collector."   Consequently, Ms. Schwartz's simply stating her phone number in response to Ms. LeFoy's request for it was not a "communication" under the FDCPA, and therefore no violation of § 1692c(b) could have possibly occurred.  *See Borden v. Meese*, 803 F.2d 1530, 1535 (11th Cir. 1986) ("Courts accord great deference to the interpretation of statutes and regulations by the agency charged with administering that regulatory scheme.").

### C.   Misrepresentations by Defendant

Third, Plaintiffs allege Allied violated the FDCPA by making misrepresentations to Ms. Gustin in a letter purportedly dated sometime in February 2011.  Complaint, ¶ 27.  Plaintiffs aver the letter "demand[s] that [Ms. Gustin] immediately begin to pay $616.00 per month or she would be subjected to garnishment and/or interception of Plaintiff's tax return."  *Id.*  Plaintiffs further allege that "[l]ess than a month later, in March 2011, the [DOE] sent [Ms. Gustin]

---

[2] The FTC is the federal regulatory agency responsible for enforcement and interpretation of the FDCPA.

a letter stating Plaintiff's monthly payment would be (only) $240.00 per month." *Id.* ¶ 29.  Plaintiffs contend "[t]his payment arrangement from the original creditor shows that [Allied's] assertion and threats were misleading, and were merely an attempt to exploit as much money as possible from the Plaintiffs." *Id.* ¶ 30.

Allied has no record of sending such a correspondence to Ms. Gustin, and Plaintiffs have produced a copy of neither Allied's nor DOE's purported correspondence.   It is axiomatic, therefore, that Plaintiffs' FDCPA claim of misrepresentation based upon the two letters is due to be dismissed.

## II.   **Plaintiffs' Negligence Claim Fails, As Allied Owed No Legal Duty to Plaintiffs and Allied Did Not Breach Any Duty Allegedly Owed to Them.**

Plaintiffs' negligence claim, *see* Complaint, ¶¶ 34-38, fails as a matter of law because Plaintiffs have failed to prove that Allied owed them a legal duty and that Allied breached any duty allegedly owed to them.  "To establish negligence, a plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994) (citation omitted).  Whether a legal duty exists is a question of law.  *Rose v. Miller & Co.*, 432 So. 2d 1237, 1238 (Ala. 1983).  Plaintiffs' Complaint fails to reference any duty whatsoever that Allied allegedly owes to them.

Instead, the Complaint merely asserts that Allied "knew or should have known that [the conduct set forth herein] was *improper*," and "Defendant negligently failed to prevent and/or participated in *improper* collection activities." Complaint, ¶¶ 36-37 (emphasis added). Setting aside the fact that Count Two therefore fails on its face to assert a negligence claim, in *Winberry v. United Collection Bureau, Inc.*, 697 F. Supp. 2d 1279, 1294 (M.D. Ala. 2010), the court found that an FDCPA violation, even if one occurred, did not provide a statutory duty to support a negligence claim and dismissed the plaintiff's negligence per se and negligence claims. Similarly, in *Alleyne v. Midland Mortgage Co.*, 2006 WL 2860811 (D. Colo. 2006), the court dismissed the plaintiff's negligence per se claims based upon an FDCPA standard of care because the "FDCPA does not establish any 'standards of care' nor does it provide a basis for tort liability. *Id.* at *12-13.

> [S]imply because the FDCPA's statutory purpose is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses. . ." 15 U.S.C. § 1692(e), an independent duty to a debtor is not created. Further, the FDCPA was not enacted for the public's safety, and cannot reasonably be implicated as a causation factor in plaintiff's claimed "injury" even if an FDCPA violation had occurred. The FDCPA also provides its own remedies for violations, which do not exist at common law and the FDCPA therefore cannot be relied upon to support a negligence per se claim. *Henry v. Kemp*, 829 P.2d 505, 506 (Colo. App. 1992) (citations omitted) (where a statute provides a

specific means of enforcing legal duties that are unknown at common law, that statutory remedy will be considered exclusive).

*Id.*

Here, Plaintiffs base their negligence claim exclusively on a duty purportedly arising from the FDCPA.  However, the FDCPA is not a "codification of negligence principles."  *Byes v. Credit Bureau Enterprises, Inc.*, 21996 WL 99360 at *3 (E.D. La. 1996).  Simply put, the FDCPA does not create a duty or standard of care for the enforcement of state law tort claims, and Plaintiffs' negligence claim fails because they are unable to show that Allied owed them a duty independent of the FDCPA and that Allied breached any duty allegedly owed to them.

## III.   Allied Was Not Reckless or Wanton in Its Collection Efforts.

Plaintiff's recklessness and wantonness claim, *see* Complaint, ¶¶ 39-43, also fails because Allied did not consciously or intentionally commit a wrongful act which produced injury to Plaintiffs.  "Wantonness has been defined as the conscious doing of some act or the omission of some duty which under knowledge of existing conditions and while conscious that, from the doing of such act or the omission of such duty, injury will likely or probably result. . ."  *Roberts v. Brown*, 384 So. 2d 1047, 1048 (Ala. 1980) (internal quotation omitted).  "Before a party could be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some

wrongful act or omitted some known duty which produced the injury." *Salter v. Westra*, 904 F.2d 1517, 1524 (11th Cir. 1990) (internal quotation omitted). "The most crucial element of wantonness is knowledge." *Roberts* at 1048.

Plaintiffs cannot meet that standard. Plaintiffs allege Allied unlawfully contacted Ms. Gustin when it knew she was represented by an attorney. As set forth above, the evidence demonstrates that Allied made reasonable efforts to determine whether, in fact, Mr. Goldasich represented Ms. Gustin in connection with the subject debt. Further, Plaintiffs aver that Allied unlawfully contacted a third-party, Ms. LeFoy, in an attempt to coerce Ms. Gustin into paying the debt and that Allied disclosed information about the debt to Ms. LeFoy. As Ms. LeFoy's and Yvetta Schwartz's testimony makes clear, however, Plaintiffs are mistaken in all material respects. It is axiomatic that leaving one's telephone number with an individual who requests it cannot constitute a conscious and intentional wrongful act sufficient to satisfy a wantonness claim. Finally, Plaintiffs contend that in February 2011, Allied sent Ms. Gustin a letter containing various misrepresentations. As Plaintiffs have failed to produce the alleged letter, any claim for wantonness based on the letter must fail. Accordingly, Plaintiffs' wantonness claim should be dismissed.

## IV.   **Plaintiffs' Invasion of Privacy Claim Fails as a Matter of Law.**

Plaintiffs' sixth claim is for invasion of privacy.  *See* Complaint, ¶¶ 56-61 (in which Plaintiffs allege baldly that "[t]he Defendant undertook and/or directed communications to the Plaintiffs constituting an invasion of privacy. . . ."). Allied's collection efforts toward Ms. Gustin do not violate Alabama common law regarding invasion of privacy.  Alabama law recognizes the right of collection agencies to collect debts.  Alabama law further recognizes an invasion of privacy claim based upon a creditor's collection efforts where there is a "wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Jacksonville State Bank v. Barnwell*, 481 So. 2d 863, 865 (Ala. 1985); *Liberty Loan Corp. v. Maxwell*, 410 So. 2d 45, 47 (Ala. 1982); *Shuler v. Ingram & Assocs.*, 441 Fed. Appx. 712, 720 (11th Cir. 2011).  As the Alabama Supreme Court has cautioned, however, not every effort to collect a debt rises to the level of a cause of action for the debtor.  "The mere effort . . . to collect a debt cannot **without more** be considered a wrongful and actionable intrusion.  The Alabama Supreme Court has "'recognized the right of a creditor to take reasonable action to pursue a debtor and collect a debt.'"  *Shuler*, 441 Fed. Appx. at 720 (quoting *Barnwell*, 481 So. 2d at 865).  It is only where the creditor or collector takes actions which "exceed the bounds of reasonableness," that the debtor has an action against the creditor for injuries suffered.  *See Barnwell*, 481 So. 2d at 865-66;

*Shuler*, 441 Fed. Appx. at 720 (quoting 481 So. 2d at 865-66 (finding, in part, that 28 to 35 phone calls to one's home and place of employment fall within the realm of a "systematic campaign of harassment").

In *Shuler*, the Eleventh Circuit determined the district court properly found that the collection agency Ingram & Associates did not invade the Shulers's privacy "because Ingram had the right to make reasonable efforts to collect the debt and the single telephone conversation with Ms. Shuler about payment arrangements and the legal consequences of not paying the debt did not exceed the bounds of reasonableness." 441 Fed. Appx. at 720. The court noted that although Ms. Shuler became hysterical during the call, the Shulers offered no specific facts showing that Ingram was attempting by harassment to coerce her into payment arrangements or to frighten her with the prospect of selling the Shulers's house. *Id.* at 720. Thus, according to the Eleventh Circuit, the Shulers failed to show how that conversation wrongfully would cause mental suffering or humiliation to a person of ordinary sensibilities. *Id.*

Collection efforts may be annoying, embarrassing, and upsetting without rising to the level of an invasion of privacy. *Leahey v. Franklin Collection Service, Inc.*, 2010 WL 5279831, *4 (N.D. Ala. Feb. 4, 2010)). For example, the court in *Leahey* noted that in *Windsor v. General Motors Acceptance Corp.*, 295 Ala. 80, 323 So. 2d 350 (1975), the debtor's mother brought a claim for invasion of privacy

based on the creditor's repeated attempts to collect car payments. *Leahey*, 2010 WL at *4. Over a one- to two-year period, the creditor attempted to contact the debtor 15 to 20 times by telephone or through home visits. *Id.* at *4. On several occasions, the creditor spoke with the debtor's mother, who testified that she found the communications upsetting and, on one occasion, the communications caused her to be hospitalized. *Id.* at *4 (citing *Windsor*, 323 So. 2d at 351-52). Nevertheless, the Supreme Court upheld the trial court's directed verdict in the creditor's favor after determining that the evidence was insufficient to sustain a claim for invasion of privacy. *Leahey*, 2010 WL at *4 (citing *Windsor*, 323 So. 2d at 352). The court in *Leahey* also found persuasive the court's rationale in *Sparks v. Phillips & Cohen Assocs., Ltd.*, 641 F. Supp. 2d 1234, 1252-53 (S.D. Ala. 2008) (finding a violation of the FDCPA but applying Alabama law and determining that a creditor did not commit the tort of invasion of privacy by contacting an attorney more than once about a debt for which she had no responsibility, contacting her minor daughter, and engaging in rude and combative conversations).

In *Strange v. Davis*, 44 So. 3d 1109, 1117 (Ala. Civ. App. 2010), Strange, who had contracted with Davis to purchase a house he owned, claimed that Davis had harassed her, thereby interfering with her peaceable and quiet enjoyment of the house. In her deposition, Strange testified that Davis harassed her when, on two separate occasions, he spoke with Strange's daughter to demand a monthly

payment.  *Id.* at 1117.  In his summary judgment motion, Davis argued that mere efforts to collect a debt in a reasonable manner, without more, cannot be considered actionable, and both the trial court and Court of Civil Appeals agreed. *Id.* (citing *Liberty Loan Corp. of Gadsden v. Mizell*, 410 So. 2d 45, 47-48 (Ala. 1982)).  In affirming summary judgment for Davis, the court determined Strange had not introduced any evidence indicating that Davis acted in such a manner as to warrant the conclusion that he committed any actionable conduct in merely attempting to collect payment from Strange.  44 So. 3d at 1117.

Finally, in *Hart v. General Motors Acceptance Corp.*, 437 So. 2d 1255, 1256-57 (Ala. 1983), the Supreme Court found persuasive the court's rationale in *Berrier v. Beneficial Finance, Inc.*, 234 F. Supp. 204 (N.D. Ind. 1964).  In *Berrier*, the court held that summary judgment was proper where the plaintiff could show only that the creditor made two telephone calls to the plaintiff's employer, and there was no evidence to show the creditor's conduct was otherwise unreasonable, "even if it had some coercive effect."  *Hart*, 437 So. 2d at 1257.

Even taking as true all facts alleged by Plaintiffs, the intrusion which they allege is insufficient to establish an invasion of privacy claim under Alabama law. The invasion of privacy alleged by Plaintiffs is less severe than the numerous calls and home visits in *Windsor*, *supra*, or the multiple contacts in *Sparks*, *supra*, including one with a minor, which were determined to be insufficiently outrageous

to sustain a claim for invasion of privacy.  There is simply nothing that "exceeds the bounds of reasonableness" as to Allied's collection efforts toward Ms. Gustin. Consequently, Plaintiffs' claim for invasion of privacy fails as a matter of law.

**V.      Plaintiffs' Outrage Claim Fails as a Matter of Law.**

Plaintiffs' seventh claim is for the severely circumscribed cause of action in Alabama known as intentional infliction of emotional distress or tort of outrage. Complaint, ¶¶ 62-64.  *See also Blow v. Virginia College*, 2012 WL 6685683, *2 (N.D. Ala. 2012) (under Alabama law, the tort of outrage and the intentional infliction of emotional distress are the same cause of action) (quoting *Sphere Drake Ins., P.L.C. v. Shoney's, Inc.*, 923 F. Supp. 1481, 1491 (M.D. Ala. 1996)).

Not only can Plaintiffs adduce no evidence whatsoever in support of their outrage claim, "[t]he tort of outrage is an extremely limited cause of action" in Alabama.  *See Jackson v. Countrywide Home Loans, Inc.*, 2012 WL 777180, *8 (quoting *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000)).  To recover for outrage, a plaintiff must show that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.  *Jackson*, 2012 WL at *8 (citing *Potts*, 771 So. 2d at 465 (in turn quoting *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990))).  Alabama courts have allowed recovery on an outrage claim in only three narrow circumstances: (1) wrongful

conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment. *Jackson*, 2012 WL at *8 (citing *Potts*, 771 So. 2d at 465; *Little v. Robinson*, 72 So. 3d 1168, 1172–73 (Ala. 2011)).

In *Jackson*, the court reasoned that "[a]lthough the Alabama Supreme Court has cautioned against an interpretation of the tort of outrage as being viable only in those three circumstances, it is not this Court's commission to redefine the present boundaries of state law claims. Accordingly, Plaintiff's tort of outrage claim, which is related to Defendants' alleged debt collection efforts and which does not fall into one of the presently recognized contexts in which a tort of outrage claim is appropriate, is due to be dismissed." *Jackson*, 2012 WL at *8 (citing *Little*, 72 So. 3d at 1173).

Here, as Plaintiffs' outrage claim is predicated entirely on Allied's collection efforts, none of their allegations falls within the severely limited factual scenarios necessary to sustain this claim. No Alabama court has ever recognized collection efforts as the basis for an outrage claim. Further, outrageous conduct is "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980). No Alabama court has ever determined collection efforts satisfy such a

heightened standard.  Plaintiffs have failed to assert a factual predicate necessary to sustain their claim for outrage, and it should therefore be dismissed.

## VI.   Plaintiffs' Claims for Negligent Training and Supervision and Reckless and Wanton Training and Supervision Claims Fail As a Matter of Law.

Plaintiffs allege in Counts Four and Five that Allied is liable for negligent, reckless and wanton training and supervision.  Complaint, ¶¶ 44-55.  A party alleging defects in training and supervision must prove the underlying wrongful conduct of employees.  *Shuler*, 441 Fed. Appx. at 720 (citing *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003); *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)).  Further, Plaintiffs must first "establish that the allegedly incompetent employee committed a common-law, Alabama tort."  *Shuler*, 441 Fed. Appx. at 720-21 (quoting *Thrasher*, 195 F. Supp. 2d at 1320); *Jackson*, 2012 WL at *8 (quoting *Leahey*, 756 F. Supp. 2d at 1328-29) ("Because Leahey's invasion of privacy claim fails as a matter of law, he cannot sustain a claim for negligent or wanton hiring or supervision.")).  *See also  Thomas v. Util. Trailer Mfg. Co.*, No. 1:05cv914, 2006 WL 2480057, at *3 (M.D. Ala. 2006).  Further, Alabama law defines "wantonness" as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others."  *Shuler*, 441 Fed. Appx. at 721 (quoting Ala. Code § 6–11–20(b)(3)).  "'Wanton supervision' requires that the employer wantonly disregard its agent's

incompetence." *Shuler*, 441 Fed. Appx. at 721 (quoting *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001)).

In *Shuler*, the Eleventh Circuit concluded that Shulers's wanton and reckless supervision and training claim failed as a matter of law because they failed to establish that Ingram's employees committed any tort under Alabama law—including fraud, invasion of privacy, or defamation.   441 Fed. Appx. at 721. Further, in *Jackson*, the court determined that Plaintiff's negligent or wanton hiring claim was due to be dismissed because, first, the court had dismissed all of Plaintiff's other tort claims.  2012 WL at *8.  Second, according to the court, the usual common-law Alabama tort many plaintiffs seek to prove in advance of proving negligent and or wanton hiring in the debt collection context is invasion of privacy.  *Id.* at *8.  The court reasoned that "[a]s stated by the Judge Kallon in the Northern District of Alabama, '[c]reditor debtor cases in which courts have upheld an invasion of privacy claim present far more egregious facts' than those alleged in the present case."  *Id.* (quoting *Leahey*, 756 F. Supp. 2d at 1328) (in turn citing *Barnwell*, 481 So. 2d 863 (Ala. 1985) and *Black v. Aegis Consumer Funding Grp., Inc.*, No. 99cv412, 2001 WL 228062, at *4–7 (S.D. Ala. Feb. 8, 2001)).  The court in *Jackson* determined, therefore, that the plaintiff had not alleged an invasion of privacy cause of action "nor do the alleged facts support such a cause of action.

Accordingly, Plaintiff's negligent or wanton hiring claim is due to be dismissed with prejudice." *Jackson*, 2012 WL at *8.

Because all of Plaintiffs' underlying common law tort claims fail, i.e., negligence, recklessness and wantonness, invasion of privacy and outrage, their claims for negligent, reckless and wanton training and supervision likewise fail as a matter of law.

**VII.** **As all of Allied's collection efforts were directed to Ms. Gustin, James Gustin's claims, with the possible exception of the § 1692c claims, are due to be dismissed for lack of standing.**

Plaintiffs' Complaint is devoid of any reliable allegation that Allied attempted any collection efforts whatsoever toward Mr. Gustin.  In his deposition, Mr. Gustin testified he "thinks" he remembers giving his cell phone number to Allied so Ms. Gustin would not have to "deal with it personally.  If they took advantage of that or didn't, I don't remember."  James Gustin Dep., p. 20, a copy of which is attached hereto as Exhibit Q.  Mr. Gustin testified further as follows:

> Q. Okay.  And until you gave your number to Allied for them to call you on that number so they—so your wife wouldn't have to talk with Allied, Allied never sought you out or never tried to talk with you about the debt?
>
> A. Not to my recollection. . . .
>
> Q. Prior to your giving your cell phone number to Allied, Allied never targeted collection communications to you?
>
> A. No.

Q. And would it be fair to say you voluntarily became involved so that your wife would not be involved?

A. Yes.

Q. Or at least that was your hope?

A. Right, right.

James Gustin Dep., pp. 20-22.

A "non-consumer" spouse is considered to be a "consumer" for purposes of 15 U.S.C. § 1692c only.  Therefore, a debt collector may be liable to a consumer's spouse for violations of § 1692c only.  *See Correa v. BAC Home Loans Servicing LP*, 853 F. Supp. 2d 1203, 1208-09 (M.D. Fla. 2012) (citing *Quinlan v. Citimortgage, Inc.*, No. 2:11–cv–000986–MCE–EFB, 2011 WL 2516236, *3 (E.D. Cal. 2011)).  As in *Correa*, Mr. Gustin has failed to show how he was obligated to pay Ms. Gustin's loan in any way whatsoever.  *See* 853 F. Supp. 2d at 1209. Further, as Mr. Gustin was not injured by Allied's collection efforts, and he voluntarily became involved in the underlying collection activity, he has no standing to bring a claim under the FDCPA or Alabama common law, again with the possible exception of Plaintiffs' § 1692c claims.  *See id.* at 1209 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendant Allied Interstate

LLC respectfully requests that the Court enter full and final summary judgment in

Allied's favor and against Plaintiffs as set forth herein.

Respectfully submitted,

/s/ L. Jackson Young, Jr.
Neal D. Moore III
L. Jackson Young, Jr. (ASB-7946-G65L)
*Attorneys for Defendant*
*Allied Interstate LLC*

**OF COUNSEL:**
FERGUSON, FROST & DODSON, LLP
2500 Acton Road, Suite 200
Birmingham, Alabama 35243
(205) 879-8722 – telephone
(205) 879-8831 – telecopier
Email:  ljy@ffdlaw.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this the 4th day of March, 2013, a copy of the
forgoing document has been served upon counsel for all parties to this proceeding
by the following method:

_____mailing the same by first-class United States mail,
                properly addressed and postage pre-paid

_____hand delivery

_____via electronic mail

_____X_____electronically via CM/ECF

John C. Hubbard, Esq. (johnchubbard@gmail.com)
Michael W. Lindsey, Esq.
Jauregui & Lindsey, LLC
2110 Devereux Circle
Birmingham, Alabama 35253

Dennis E. Goldasich, Jr., Esq. (dennis@golaw.net)
Goldasich & Associates, LLC
2100 Third Avenue North
Suite 700
Birmingham, Alabama 35203

/s/ L. Jackson Young, Jr.
Of Counsel
